Peter C. Rumbin,
    *Plaintiff*,

    *v.*

Association of American Medical Colleges,
    *Defendant.*

Civil No. 3:08cv983 (JBA)

March 21, 2011

## MEMORANDUM OF DECISION

Plaintiff Peter Charles Rumbin filed suit *pro se* against Defendant Association of American Medical Colleges ("AAMC") under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181.  He claims that he reported to Defendant that he was severely limited in the major life activities of seeing and reading, but his requests for accommodations in taking the Medical College Admission Test ("MCAT"), administered by Defendant, were unlawfully denied.  A bench trial was held on Plaintiff's claims in June 2010.

## I.     Procedural Background

After the AAMC denied Mr. Rumbin's accommodation request for the MCAT, he filed suit in small claims court, which was dismissed.  On February 11, 2008, he filed a disability discrimination complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), asserting that AAMC denied him "reasonable accommodation on the basis of a disability on or about August 2007," in violation of Conn. Gen. Stat. §§ 46a-58(a) and 46a-64(a) and the ADA.  He identified his disability as "glaucoma, ocular misalignment."

On June 26, 2008, Mr. Rumbin filed suit in Connecticut Superior Court, and on June 30, 2008, he initiated this action, receiving a release of CHRO jurisdiction on September 15, 2008. He asserts that he applied for but was denied MCAT testing accommodations in 2001, 2002, 2005, 2006, 2007, and 2008. In addition to AAMC, he initially sued testing companies Prometric, Inc. ("Prometric") and Sylvan Learning, Inc. ("Sylvan"). The accommodation action requested the following relief: three days to take the MCAT, submission by the AAMC submit his MCAT practice test results to medical schools, and $14–15 million and damages for years of lost earnings and future lost earnings. On March 9, 2009, the Court dismissed Prometric and Sylvan as defendants and granted AAMC's Motion to Dismiss Mr. Rumbin's damages claim under Title III of the ADA, under which damages cannot be awarded, and his request for an injunction requiring AAMC to accept and certify as official his practice MCAT results. The claim that remained for trial was Mr. Rumbin's ADA claim against AAMC, seeking injunctive relief.[1]

---

[1] After trial, Mr. Rumbin moved [Doc. # 165] under Fed. R. Civ. P. 15 for leave to amend his complaint, to add a second count claiming violations of his rights under the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983. "A district court may properly deny a motion to amend when it finds that amendment would be futile." *Patane v. Clark*, 508 F.3d 106, 113 n.6 (2d Cir. 2007) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Not only is Mr. Rumbin's motion for leave to amend his complaint vastly untimely, given that his proposed cause of action is based on allegations known to him well before trial, but it also futile, given that the AAMC is a non–profit entity, not a state actor, and "[t]o state a claim under § 1983, a plaintiff must demonstrate that the defendant acted 'under color of' state law," and "[i]t is settled that conduct by a private entity constitutes state action only when 'there is a sufficiently close nexus between the State and the challenged action of the [private] entity so that the action of the latter may be fairly treated as that of the State itself." *Tancredi v. Metropolitan Life Ins. Co.*, 378 F.3d 220, 229 (2d Cir. 2004) (quoting *Jackson v. Metro Edison Co.*, 419 U.S. 345, 351 (1974)). Mr. Rumbin neither alleges in his proposed complaint nor has pointed to any evidence from trial that there was any nexus between the State and the AAMC's actions in reviewing his request for accommodations. Thus, Mr. Rumbin's

II.     Findings of Fact

        A.      AAMC Accommodation Requests Procedures

The AAMC is a non–profit membership organization that represents medical schools and teaching hospitals. It provides a centralized application service for medical schools in the United States and Canada. (*See* June 30, 2010 Trial Tr.) Its testing personnel develop and administer the MCAT, scores for which are considered by medical schools in evaluating applications. Nearly 63,000 people took the MCAT in 2009. The exam is designed to predict success in the first few years of medical school, and it correlates with performance on the United States Medical Licensing Examination ("USMLE") Step 1. As of 2009, the test has four hours and twenty minutes worth of content, and test–takers sit for five hours and twenty minutes total, including breaks between sections. Approximately twenty percent of test takers fail to complete the test. Prior to 2006, the test was administered with paper and pencil, since 2007, it is only offered on computers with nineteen–inch monitors.

The AAMC has established procedures that disabled test takers may use to request accommodations and has published those procedures in a document titled "Documenting Physical Disabilities" available on the AAMC website. (*See* Ex. TT.[2]) According to the testimony of Michelle Sparacino, the AAMC Director of Test Administration and Operations, the accommodations–request procedures were designed to ensure that the AAMC gives accommodations only when necessary and only to the extent required, to avoid giving any test–takers unfair advantages.

motion for leave to amend is denied.

[2] Defendant's exhibits are marked with letters; Plaintiff's exhibits are marked with numbers.

The AAMC provides a number of accommodations for test–takers, several of which are adjustments to the testing computers for people with visual disabilities. For example, the AAMC can provide "zoom text," which increases font sizes up to 36 times, gives test–takers screen overlays to reduce glare, and can adjust contrast on monitors. The AAMC can also give extra breaks in between examination sections, so disabled test takers may rest their eyes. Although the AAMC can give extra time, it is reluctant to do so, because according to Sparacino, unlike other accommodations, studies show that scores on tests taken with extra time are not equivalent to scores on tests taken with standardized timing. According to Sparacino, in 2008, the AAMC received 700 to 800 requests for accommodations, more than 50 percent of which were granted, and 10 to 20 percent of which were incomplete.

B.       Convergence Insufficiency

Although his initial requests for accommodation on the MCAT cited glaucoma as the basis for his disability, Mr. Rumbin and his treating opthamologist David McCullough clarified during trial that it is his "convergence insufficiency" that causes his difficulty seeing and reading and that necessitates accommodation. Plaintiff no longer claims that his glaucoma requires accommodation.

Convergence insufficiency occurs when an individual tries to turn his eyes inwards, towards each other, resulting in difficulty in visually focusing on close–in objects. It can cause headaches, fatigue, eye strain, and double vision. According to Jack Terry, Executive Director of the National Board of Examiners in Optometry, who reviewed Mr. Rumbin's accommodations requests for the AAMC, convergence insufficiency is diagnosed based on objective factors, including "near–point of convergence," ("NPC"), i.e., the number of centimeters from one's nose at which he or she sees double or one eye deviates out, and

subjective factors, including whether the patient suffers from headaches after prolonged reading or visual difficulty while reading. Both Mr. Terry and Dr. McCullough agree that an NPC of ten centimeters is on cusp of the "normal range" and does not, in and of itself, demonstrate convergence insufficiency.

        C.      Mr. Rumbin's Visual Difficulties

Mr. Rumbin testified that he struggles with tiny, dense text. He has difficulty reading books with shiny pages, such as textbooks. Nonetheless, Mr. Rumbin graduated with a B.S. in physics from Southern Connecticut State University, having begun his undergraduate studies at the University of Chicago and studied at Harvard University. Although he was not given formal accommodations for vision problems while in college, Mr. Rumbin succeeded by using reading strategies such as "mapping passages," whereby he would use a pencil to read lines, circle key words, and outline passages; while at Harvard, he received "informal accommodations" such as separate proctoring for examinations. Mr. Rumbin pursued graduate degrees in mathematics at Wesleyan College and Columbia University, and although he completed his doctoral qualifying examination and wrote a masters essay, for financial reasons, he never completed these degrees. Mr. Rumbin has taken the Law School Admissions Test without accommodations and said that as a result, he had "very low scores."

Mr. Rumbin has difficulty with everyday tasks such as grocery shopping and using ATMs as a result of his visual deficiencies. He testified at length about how long it takes for him to read the fine print on products at the supermarket to meet his special dietary needs and about his difficulty at times distinguishing among bills of varying denominations. He also said that he avoids using computers and relies on others to send and receive emails on his behalf.

Despite these challenges, Mr. Rumbin also testified that he recently worked for three years as a biophysics research assistant on a team at Yale University that won the 2009 Nobel Prize in Chemistry for x–ray defraction studies of the structure of molecules and mapping the ribosome. Mr. Rumbin's work involved reviewing computer–generated electron–density maps in a plexiglass viewing box and writing computer programs, which he says did not require use of a computer. Mr. Rumbin testified that his visual difficulties did not hinder his work at Yale. Mr. Rumbin also previously worked as a tutor at Southern Connecticut State University and as a lifeguard, for which he needed no accommodations and was not limited by his vision problems.

Mr. Rumbin testified that he is an avid painter, has submitted landscape paintings in national competitions, and reads books.

C.      Mr. Rumbin's Applications for Accommodation

Mr. Rumbin has registered for and took the MCAT in 1978, 1979, 1983, and 1988 without accommodations. (*See* Mr. Rumbin MCAT Info, Ex. SS.) He testified that he registered for the August 2005 MCAT and applied for an accommodation for glaucoma but was not notified until the day before the exam date that his request was denied. In support of Mr. Rumbin's application to take the August 2006 MCAT with accommodations for glaucoma, Dr. McCullough faxed a note to the MCAT Program Office on March 26, 2006 explaining that "Peter Rumbin has a visual field deficit that slows his reading ability" and further requesting that the test administrators "allow him extra time taking his MCAT tests." The fax included no further information. (Ex. C.)

On May 30, 2006, the MCAT Accommodations Office at the AAMC responded to Mr. Rumbin, explaining that it could not process his request for accommodation because he

had not completed his registration, he did not have a current fee waiver, and his request for accommodations was insufficient. (Ex. E.) The letter noted that Mr. Rumbin was required to "specify *what* accommodations you are seeking on the MCAT Examination (i.e. extended time . . . separate room, etc.) and state your disability in the form of a cover letter." (*Id.* (emphasis in original).) Further, the letter explained that "documentation must support your request for accommodation(s)," which Mr. Rumbin had failed to provide. The letter also directed Mr. Rumbin to the AAMC's website, http://www.aamc.org/ students/mcat/about/ada2003.pdf, where he could find a copy of the *2006 MCAT Disabilities Accommodations Document*, a copy of which was attached to the letter. (*Id.*) Finally, the letter stated that if Mr. Rumbin had any remaining questions, he should contact the Accommodations Office.

On June 17, 2006, Mr. Rumbin wrote to the MCAT Accommodations Office specifying that his glaucoma and eye infection "cause[] my eyes to tear," a problem that increases "as the day passes," such that "I will have to stop reading and resume the test the next day because I will not be able to read, and grid my answers." (Ex. F.) He said that not only would he "need to blot my eyes and . . . stop and apply a warm compress to my eyes," but he would also "lo[]se time transferring answers to the answer grid." Mr. Rumbin requested accommodations including having the proctor check that his answers have been entered correctly; having the test administered in a "distraction free environment because when I am working I do not wish to be interrupted or disturbed since my productive examination time is most valuable"; and up to "11 times" the normal time allotted for the examination. (*Id.*) His letter said that he had attached copies of his prescriptions,

appointments, and information, but that "no doctor will send you extensive data" because of "doctor patient confidentiality laws [that] are strictly enforced in Connecticut."   (*Id.*)

On August 2, 2006, the AAMC sent Mr. Rumbin a letter acknowledging receipt of his request for accommodation and notifying him that "[o]nce [his] request for special accommodations is processed, MCAT will notify [him]."  (Ex. 0.)  Attached to that letter was an admissions ticket for Mr. Rumbin to take the August 2006 MCAT examination that listed as test center "MCAT Testing Accommodations" and specified in the "Notice" section that "[y]our application with an accommodation request has been processed.  An approved or denied letter with test center info will follow."  (Ex. 1.)[3]  The AAMC sent another letter on August 2, 2006, denying his request for accommodation and advising Mr. Rumbin that his diagnosis of glaucoma is not in dispute, but that "[it] is necessary for [him] to submit current, medical information regarding [his] diagnosis of glaucoma, its severity, precisely how it impacts [him] and what accommodations will mitigate the impact."  (Ex. G.)

On August 15, 2006, Dr. McCullough sent another note to the AAMC, received on August 22, 2006, stating

> Peter Rumbin has glaucoma with reduced visual field, peripheral vision and significant myopia.  These combined conditions make reading a slower task for him compared to a normal sighted person.  I ask that you allow him extra time in taking standardized tests, such as the MCAT, because of his reading difficulties.

(Ex. I.)

---

[3] Mr. Rumbin insists that this admissions ticket is evidence that he was at one time offered an accommodation by the AAMC but denied it at the testing center.  However, the admissions ticket nowhere says that Mr. Rumbin was actually approved for an accommodation; it simply says that his request was under consideration.

On February 5, 2007, Dr. McCullough examined Mr. Rumbin and filled out a form titled "Vision Evaluation Report," used by the Law School Admission Council ("LSAC"), which he submitted to the AAMC. (*See* Ex. 5.) Dr. McCullough reported for the first time that Mr. Rumbin's convergence insufficiency, not his glaucoma, required accommodation. He based his determination on Mr. Rumbin's NPC of ten centimeters. (*Id.*) Although he never observed Mr. Rumbin take an MCAT practice examination, Dr. McCullough observed Mr. Rumbin reading and noted that over time, his reading slowed. Dr. McCullough concluded that

> Rumbin has great difficulty 'reading' or test taking for more than 30 mins. at a time. He requires a 10 min. break every 20–30 mins of test taking. He develops double vision, head ache & eye strain if forced to go beyond 20–30 min of test taking. Computer use is even more difficult for him & I strongly recommend that he take a 'paper' test. Not only does Mr. Rumbin become diplopic, fatigued, and head achy *and* develops eye strain when test taking, but because of his ocular misalignment he has great difficulty in transferring his answers to a 'bubble' format. He requires extra time to re–confirm that his transferred answers are filled in the proper space on the answer sheet.

(*Id.* (emphasis in original).) Dr. McCullough did not test Mr. Rumbin for eye fatigue and did not provide any data comparing Mr. Rumbin's reading skills to the general population.

On July 28, 2007, Dr. McCullough sent a follow–up letter recommending that Mr. Rumbin be allowed to take a paper and pencil version of the MCAT and be given a 5 to 10 minute break every 20 to 30 minutes of test taking "to allow his eye muscles to rest." (Ex. Q.) Dr. McCullough further noted that Mr. Rumbin's "occular misalignment can easily cause him to misalign the 'bubbles' on the answer sheet and code the answer in the wrong 'slot,'" and therefore, Mr. Rumbin "should be given extra time to recheck the transposition of his answers."

Sparacino emailed Mr. Rumbin in late–August 2007, informing him that the AAMC received documentation from his doctor in early 2007, and review of his accommodation request would not be completed until October 2007, after the last 2007 sitting for the examination. (Ex. S.) On October 19, 2007, Mr. Terry completed an ADA Accommodation Evaluation Survey based on Dr. McCullough's findings. (Def.'s Ex. T.) Mr. Terry's ultimate recommendation was "approval of accommodation, but different than requested by candidate." His evaluation concluded that "the examination records reveal that the candidate's near point of convergence is normal at 10 centimeters (with glasses). Also, no specific visual assessment was performed during reading or testing conditions to substantiate the level of difficulty in reading or its full etiology." (*Id.*) The evaluation further noted that Dr. McCullough "provided no description of the beneficial effects that orthoptics or other therapies are having in reducing any associated symptoms." (*Id.*) With respect to the ocular misalignment, which Dr. McCullough said affected Plaintiff's ability to bubble–in answers, Mr. Terry noted that Dr. McCullough "does not provide the documentation of the testing that was performed to establish this deficiency," and that "the examiner does not explain why a paper examination which requires the use of a bubble sheet would be preferable over a computer–based test that does not utilize a bubble sheet." On October 25, 2007, John Hosterman, Ph.D., the AAMC Director of Accommodations Review sent Mr. Rumbin a letter explaining that based on Mr. Terry's review, Mr. Rumbin's request for accommodations would be denied, although he could always provide additional supporting documentation. (Ex. U.)

On February 11, 2008, Randy Schulman, a behavioral optometrist, analyzed Mr. Rumbin's condition and provided the AAMC with additional observations from her

examination of Mr. Rumbin's eyes, including that Mr. Rumbin's "near point of convergence was 4"/10" instead of the expected 3"/4–6 "," that Mr. Rumbin had difficulty on eye movement testing both on observations and standardized tests, and that "[o]n the Developmental Eye Movement [("DEM")]Test , which assesses eye movement speed and accuracy, Peter scored at a 6 year-old level." (*Id.*)  She noted that on the Van Orden Star Test, Mr. Rumbin "had some difficulty with binocular skills and visual motor integration." (*Id.*) Schulman "diagnosed Peter with convergence insufficiency, binocular dysfunction and oculomotor dysfunction."  She explained that Mr. Rumbin's "diagnoses are medical in nature and cannot be treated with medications" and that "[g]lasses are sometimes helpful but the most effective treatment particularly for the convergence insufficiency is vision therapy."  In the meantime, Schulman said that Mr. Rumbin "experiences considerable visual stress and has great difficulty performing any near task easily and efficiently and should be considered visually disabled at this time." (*Id.*)  Her recommendation was that the AAMC "increase the font on [Mr. Rumbin's] computer and print out material to read from the computer."  She also recommended that he be allowed 150% the normal time for the MCAT, to "allow for the breaks he requires from near work and prevent stress to his binocular and eye movement systems." (*Id.*)  When Dr. McCullough forwarded Schulman's letter to the AAMC on February 22, 2008 (Pl.'s Ex. 10),  he further opined that "[i]t is crystal clear to me that Mr. Mr. Rumbin has significant ocular misalignment, binocular dysfunction, and ocular–motor dysfunction.  Special testing conditions are necessary to adequately test his *fund of knowledge*, rather than his *incapacity to visually perform* on a computer or filling out a 'bubble' answer sheet." (*Id.* (emphasis in original).)  Dr. McCullough testified that he believed Mr. Rumbin should be given sufficient time to finish the exam to avoid unfairness.

The AAMC sent the new Schulman information to Mr. Terry for his further independent evaluation. Mr. Terry determined that contrary to Schulman's report, there were no indicia in the materials provided to the AAMC that Mr. Rumbin suffered from convergence insufficiency, let alone a condition that was severe enough to substantially impact Mr. Rumbin's ability to read. Mr. Terry recommended "denial of accommodation," citing several shortcomings with Schulman's report: (1) Schulman's oculomotor tests, including near point of convergence and phorometric testing produced findings that "were within normal variability," and "[t]he examiner did not show a ca[us]al effect between these normal results and a clinically–significant visual disability"; (2) "a 6 year old would have eye movements consistent with an adult," and "no specific visual assessment was performed during reading or other related testing conditions to substantiate the level of difficulty in reading"; (3) "[t]he examiner did not explain why convergence insufficiency, binocular dysfunction, and oculomotor dysfunction are medical (versus ophthalmic) in nature and why the prescribed glasses were inappropriate or inadequate t[o] improve the candidate's oculomotor status"; (4) Schulman did not describe Mr. Rumbin's difficulty in performing "any near task easily" was assessed and how it contributed substantively to a reduction in the candidate's ability to read and learn"; (5) "the examiner provided no description of the beneficial effects that orthoptics or other vision therapies are having in reducing any associated symptoms"; (6) "the examiner did not provide any quantification testing to the 'more time' that he suggests that the candidate requires"; and (7) "[t]he February 11, 2008 report notes that the candidate 'needs to increase the font on his computer' but does not explain why this is necessary in light of his 20/20 visual acuities at near." Mr. Terry further testified that the DEM test Schulman relied on in concluding that Mr. Rumbin reads at a six

year–old level is developed and normalized for children and cannot provide reliable results for adults, and therefore Schulman's determination of Mr. Rumbin's reading level had little evidentiary support. Dr. Hosterman sent the findings of the independent evaluator to Mr. Rumbin on April 10, 2008, denying his updated request for accommodation.

On June 28, 2008, Mr. Rumbin requested reconsideration of the AAMC's accommodation denial. On February 21, 2009, Schulman sent a follow–up letter to AAMC (Ex. II), based on her February 11, 2008 evaluation. In addition to restating her earlier findings, she clarified in the February 2009 letter that on the Visagraph III test, a standardized computerized test of extraocular movements recorded with electrodes, Mr. Rumbin scored at the second grade level, "indicating very poor reading eye movements." (*Id.*)

Mr. Terry responded in an evaluation on March 20, 2009. (Ex. JJ.) In addition to restating his earlier findings, Mr. Terry identified several additional shortcomings in Schulman's and Rumbin's. As to the Visagraph III results indicating that Mr. Rumbin's extraocular movements were at a second–grade level, Mr. Terry explained that the ability to clinically correlate such recordings "to grade level or reading level is spurious." In response to Schulman's Van Orden Star Test of Mr. Rumbin that revealed "some difficulty," Mr. Terry noted that "this lack of objective assessment does not permit a correlation of these results with the reading achievement levels." In response to Mr. Rumbin's indication this his ability to "speed read decreases substantially until I am unable to read anymore without rest and medicated eye drops," Mr. Terry determined that "[i]t is undocumented what medicated eye drops have been prescribed for this purpose (i.e., to restore reduced speed reading), by whom, their efficacy, and the duration of this treatment. It also is unclear how a reduced

13

level of speed reading substantially limits a major life activity since the vast majority of the population does not have the ability to speed read." Additionally, Mr. Terry noted that the documentation provided by Dr. McCullough is more than two years old and thus "inadequate due to the chronic and potentially progressive nature of glaucoma," and because Mr. Rumbin suffered from his visual impairments for an extended period of time,

> a timeline must be provided that documents when these conditions began that now result in the candidate's claim of a substantial limits to a major life activity. In addition, the examiner must provide an explanation as to what strategies were used by the candidate to accomplish his various academic achievements if he habitually has been "performing at the 2nd grade level in reading."

According to Mr. Terry, Mr. Rumbin's test results are "totally inconsistent with convergence insufficiency."

Although Schulman based her letter on an examination conducted in February 2008, and the AAMC had a six–month currency requirement for medical evaluations, the AAMC nonetheless credited Schulman's letter but on March 25, 2009 denied the reconsideration request based on Mr. Terry's independent evaluation. (Ex. KK.)

Dr. McCullough responded to the March 25, 2009 denial letter, explaining that glaucoma was not the basis for Mr. Rumbin's reconsideration request, but rather, it was his convergence insufficiency and other impairments. (Ex. 16.) Dr. McCullough disagreed with the evaluation's assessment, writing "[i]ncreased font size is well known to make reading easier, even in people who measure 20/20 reading acuity," and "the longer a patient with convergence insufficiency reads the more the eye muscles fatigue and the fixed prism in the eyeglasses is no longer adequate," among other responses. Mr. Rumbin testified that he has

continued to seek reconsideration and has attempted to register for the MCAT with accommodations including extra time, but has been unsuccessful.

## II. Conclusions of Law

The ADA "prohibit[s] discrimination against qualified disabled individuals by requiring that they receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in public services and public accommodations." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004) (internal citations omitted). Under the ADA, "[a]ny person that offers examinations or courses related to applications . . . for secondary or post–secondary education . . . shall offer such examination . . . in a place and manner accessible to persons with disabilities." 42 U.S.C. § 12189. Mr. Rumbin claims that the AAMC "has repeated[ly] denied accommodation to sit for the MCAT test.[4]

A person is disabled under the ADA if he has "a physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(1)(A).[5] In

---

[4] Mr. Rumbin claims that the AAMC denied him the accommodations in testing years 2001, 2002, 2005, 2006, 2007, and 2008, claims as to which the ADA Amendments Act of 2008, effective January 1, 2009, ("ADAAA") would not apply. *See* ADA Amendments Act of 2008, Pub. L. 110–325, 122 Stat. 3553 (2008); *see also, e.g., Moran v. Premier Educ. Group, LP*, 599 F. Supp. 2d 263 (D. Conn. 2009) (because the express language of the ADA Amendments Act of 2008 directed that these amendments would not take effect until January 9, 2009, the statute should not be applied retroactively). The ADAAA does, however, apply to Mr. Rumbin's claim that he continues to be denied accommodations *after* January 1, 2009. The ADAAA amended the ADA, in relevant part, by expressly including seeing, learning, and reading as examples of major life activities and by stating that "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures," including "low–vision devices," but not "ordinary eyeglasses or contact lenses."

[5] Major life activities "include but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42

*Bragdon v. Abbott*, 524 U.S. 624 (1998), the Supreme Court articulated a three–step process for determining whether a plaintiff has a disability under this subsection of the ADA. First, a plaintiff must show that he suffers from a physical or mental impairment. *Id.* at 631. Second, he must identify the activity claimed to be impaired and establish that it constitutes a "major life activity." *Id.* Third, the plaintiff must show that that impairment "substantially limits" the major life activity previously identified. *Id.* "In order to be eligible to prevail upon a further showing of discrimination, a plaintiff must satisfy each of the three prongs." *Colwell v. Suffolk County Police Dep't.*, 158 F.3d 635, 641 (2d Cir. 1998).

AAMC concedes that Mr. Rumbin has vision impairments and further concedes that the activities that Mr. Rumbin claims to be affected by his vision impairments—seeing, learning, and reading—are major life activities. (Def.'s Trial Mem. at 27.) What remains at issue, and is central to the outcome of this case, is whether the documentation submitted by Mr. Rumbin to the AAMC demonstrates that he suffers from convergence insufficiency and if so, whether it substantially limits his ability to read, see, or learn. At trial, Mr. Rumbin highlighted as evidence of his limitations Dr. McCullough and Schulman's determinations that he developed headaches, eye–fatigue, and blurred vision while reading for prolonged periods, and Mr. Rumbin emphasized his difficulty with everyday tasks such as grocery shopping and using computers.

"Although almost any impairment may, of course, in some way affect a major life activity, the ADA clearly does not consider every impaired person to be disabled. Thus, in

---

U.S.C. § 12102(2)(A). Major life activity may also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B).

assessing whether a plaintiff has a disability, courts have been careful to distinguish impairments which merely *affect* major life activities from those that *substantially limit* those activities." *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998) (emphasis in original). "The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999). The preamble to the Department of Justice regulations on nondiscrimination on the basis of disability in state and local government services—applied by the Second Circuit to an ADA Title III action in which a plaintiff sought testing accommodations because of vision problems, *see Bartlett v. N.Y. State Bd. of Law Exam'r's*, 226 F.3d 69, 80 (2d Cir. 2000)—provides that "[a] person is considered an individual with a disability when the individual's important life activities are restricted as to the conditions, the manner, or duration under which they can be performed in comparison to most people." 28 C.F.R. § 35.104.[6]

For Mr. Rumbin to be disabled under the ADA, his ability to see, learn, and read must be substantially limited by his visual impairments in comparison to "most people." The relevant comparison is not with other test–takers or future doctors, but rather, with members of the general population. *See Barlett*, 226 F.3d at 81–82 (whether a law student's learning abilities substantially limited her ability to read did not depend on whether she was limited compared to college freshmen because "because the proper reference group is 'most

---

[6] While Congress authorized the Equal Employment Opportunity Commission ("EEOC") to promulgate implementing regulations for Title I of the ADA, the Department of Justice was tasked with promulgating regulations for Title II and Title III of the Act. *See Love v. Law School Admission Council, Inc.*, 513 F. Supp.2d 206, 223 n.19 (E.D. Pa. 2007).

people,' not college freshmen"); *see also, e.g., Singh v. George Washington Univ. School of Medicine and Health Sciences*, 408 F.3d 1097, 1100–01 (D.C. Cir. 2007) (the proper comparison is to "the general population, rather than to persons of elite ability or unusual experience," *i.e.*, "an injured ultramarathoner, who could once run 100 miles at a time, is not disabled by an impairment that forces him to quit after 26.2 miles, even though his limitation is substantial as compared to his unimpaired abilities or those of his erstwhile running partners"); *Wong v. Regents of Univ. of California*, 410 F.3d 1052 (9th Cir. 2005) (the relevant question in determining whether a medical student with learning impairment was substantially limited in the major life activities of reading and learning and was "not whether he might be able to prove to a trier of fact that his learning impairment makes it impossible for him to keep up with a rigorous medical school curriculum. It was whether his impairment substantially limited his ability to learn as a whole, for purposes of daily living, as compared to most people").

Plaintiff has failed to prove by a preponderance of the evidence that he is substantially limited in his ability to see, learn, and read vis–à–vis the general population. Eye conditions, even blindness in one eye or monocular vision, are not *per se* disabilities and require case–by–case determinations as to whether they constitute substantial limitations to the major life activities of seeing, reading, and learning. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999). Here, the only objective measures of Plaintiff's convergence insufficiency do not indicate that it substantially limits his ability to see, learn, and read. It is undisputed that Plaintiff's ten centimeter NPC was on the cusp of normal, and his accommodated convergence ratio was within normal range. After reviewing Dr. McCullough's compiled data, Mr. Terry doubted whether Plaintiff had convergence

insufficiency at all, let alone suffered from the condition to the point at which reading would be a struggle. Further, there are no reliable data before the Court from which Mr. Rumbin's ability to read compared to the general population can be determined; Schulman relied on the DEM test, which was developed and normalized for children, not adults, and on the Visagraph III, which does not produce findings that can be correlated to a reading level.

Although Dr. McCullough wrote to the AAMC that Mr. Rumbin "has great difficulty 'reading' or test taking for more than 30 mins. at a time," requires breaks, and develops "double vision, head ache & eye strain if forced to go beyond 20–30 mins of test taking," and described at length the general negative impact of convergence insufficiency on test–takers, he never compared Mr. Rumbin's reading or seeing skills to the "average person." Courts determining whether individuals suffer from substantial limitations to the major life activities of learning, seeing, and reading do so based on comparative testing of reading, *see, e.g.*, *Gonzales v. National Board of Medical Examiners*, 225 F.3d 620 (6th Cir. 2000) (a medical student who suffered from an alleged learning disability and sought extended time for the USMLE Step 1 was not substantially limited in the major life activity of reading despite significant clinical evidence of a reading disorder, including an expert's conclusion that the plaintiff met the DSM–IV criteria for Reading Disorder, because the defendant's expert witness concluded that the plaintiff "read as well as the average person," based on a litany of clinical tests); *c.f. Bartlett v. New York State Bd. of Law Exam'rs*, No. 93cv4986(SS), 2001 WL 930792 (S.D.N.Y. Aug. 15, 2001) (the plaintiff was substantially limited in the major life activity  of reading based on clinical judgments made by evaluating doctors that plaintiff's "reading was more limited than the average person"), testing which Dr. McCullough did not conduct. Rather, Dr. McCullough watched Mr. Rumbin read various

documents and noted that Mr. Rumbin's reading speed decreased over the course of the day; however, there is no evidence whether this is unusual or the extent to which it departs from the norm.[7] Dr. McCullough concluded that Plaintiff would struggle to finish the MCAT, but according to Sparacino the test is, in fact, designed to be an arduous, time–pressured experience that is difficult to finish, such that many test–takers are unable to do so.

Mr. Rumbin also argues that his struggles with everyday tasks evince his substantial limitations in seeing and reading. Although Plaintiff has difficulty reading the small print on packaging at the grocery store and does not use computers or ATMs, he also reads books, paints, pursued graduate degrees, and worked on a biochemistry project at Yale University that required him to develop computer programs and read electron–density maps—all without formal accommodation. Many courts have found no ADA–covered disability where purportedly disabled individuals can both read books and perform their job–duties without formal accommodations, even when faced with other limitations in daily life. *See, e.g.*, *Carrereas v. Sajo, Garcia & Partners*, 596 F.3d 25, 34 (1st Cir. 2010) (there was no genuine issue of material fact as to whether plaintiff's diabetes substantially limited his major life activity of seeing, although he experienced bouts of blurriness, because it was undisputed that he drove to and from work every day, reads as part of his current employment, and "performs other routine activities that presumably would not be possible if his vision were substantially impaired"); *Manz v. Gaffney*, 200 F.Supp. 2d 207, 216–18 (E.D.N.Y. 2002) (plaintiff who suffered from "ocular albinism" causing his vision to "wash out" under certain conditions, had corrected vision of 20/60 in each eye, and was limited in his ability to hunt,

---

[7] Dr. McCullough acknowledged that he conducted no testing for double vision and headaches and did not observe Mr. Rumbin reading a computer screen.

watch television, and read the newspaper, was not disabled for ADA purposes, as he could drive, read, and perform the duties of his occupation), *aff'd in relevant part*, 56 F. App'x 50 (2d Cir. 2003); *Hoehn v. Int'l Sec. Servs. and Investigations, Inc.*, 244 F. Supp.2d 171–72 (W.D.N.Y. 2002) (among other reasons, because "Hoehn's vision deficit [did not] ever pose any problem with the job duties of his security guard position," he was not substantially limited in his ability to see"); *Sweet v. Electronic Data Systems, Inc.*, No. 95cv3987(MBM), 1996 WL 204471, *5 (S.D.N.Y. Apr. 26, 1996) (plaintiff's testimony that he is able to "work as a sales representative without any accommodation from his employer" weighed in favor of the court determining he was not disabled). Here, Mr. Rumbin's condition affects aspects of the way in which he leads his life. However, the evidence of his past employment requiring substantial visual focus, his ability to paint and read books, and his prior education and test–taking without accommodations, demonstrate that he is not substantially limited in the major life activities of seeing, learning, and reading. The objective measures of Mr. Rumbin's visual acuity and difficulties are within normal ranges. There is no evidence that he struggles to read significantly more than the average person, and he has worked, studied, and participated in hobbies—without formal accommodations—that require reading. The Court concludes therefore that Plaintiff has failed to prove that he is substantially limited and therefore disabled within the meaning of the ADA. Thus, he is not entitled to accommodations under the ADA or the ADAAA.

III.    Conclusion

For these reasons, the AAMC has shown that it is entitled to judgment in its favor on Plaintiff's ADA claim in the Amended Complaint [Doc. # 52–1], the only remaining claim.  Judgment shall be entered accordingly.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 21st day of March, 2011.